IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 4, 2007

## STATE OF TENNESSEE v. BENJAMIN BROWN

**Appeal from the Criminal Court for Shelby County
No. 96-13456     Carolyn Wade Blackett, Judge**

**No. W2006-02762-CCA-R3-CD  - Filed July 2, 2008**

The defendant, Benjamin Brown, was convicted by a Shelby County Criminal Court jury of first degree felony murder in the perpetration of aggravated child abuse and aggravated child abuse. For the felony murder conviction, he was sentenced as a violent offender to life in the Department of Correction, and for the aggravated child abuse conviction he was sentenced to twenty-five years, to be served concurrently. In this direct appeal, he claims (1) that the trial court improperly allowed evidence of the defendant's bad acts without conducting a hearing as required by Tennessee Rule of Evidence 404(b), (2) that the trial court committed plain error in allowing a state's expert witness to testify about the victim's cause of death without establishing a proper foundation, (3) that the court erred in failing to replace a juror who indicated she had some knowledge of one of the state's witnesses, (4) that the trial court failed to give instructions on lesser offenses, and (5) that he is entitled to a new trial based upon prosecutorial misconduct during closing argument. We hold that although the state made an improper rebuttal argument, the error was harmless, and the remaining issues are without merit. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and DAVID G. HAYES, SR. J., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellant, Benjamin Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Wheeler Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted of aggravated child abuse and felony murder committed during the perpetration of aggravated child abuse relative to the injury and ultimate death of his daughter.

After receiving concurrent sentences of twenty-five years and life, the defendant appealed to this court. This court considered the defendant's issues relative to sufficiency of the evidence and sentencing but held that consideration of the remaining issues raised was waived by the defendant's failure to file a timely motion for new trial in the trial court. State v. Benjamin Brown, No. W1999-00327-CCA-R3-CD, Shelby County (Tenn. Crim. App. Oct. 24, 2000). The case was later remanded to this court by the Tennessee Supreme Court for reconsideration of our ruling that the defendant's dual convictions violated constitutional double jeopardy protections, and we reinstated the defendant's aggravated child abuse conviction. State v. Benjamin Brown, No. W1999-00327-CCA-RD-CD, Shelby County (Tenn. Crim. App. Aug. 2, 2002).

The defendant filed a post-conviction petition seeking a delayed direct appeal. He was allowed to file a motion for new trial, which was denied after a hearing. The defendant then filed the present appeal.

The facts of the defendant's case were summarized by this court in his first appeal:

> The appellant and Tammy Huff met and started dating in 1992. A few months after they began dating, the couple announced they were getting married. Ms. Huff was pregnant at the time. The couple married on April 26, 1994, at the Hernando, Mississippi, home of Tammy's father, James Riley Banks. On the evening of his daughter's marriage to the appellant, Mr. Banks received a telephone call from an anonymous female, later identified as A[rd]ena McCoy, informing him that the appellant was the father of her children. Mr. Banks disclosed this telephone conversation to his daughter and informed his daughter that her new husband was not welcome in his home. Tammy left her new husband less than twenty-four hours after they were married, subsequently divorcing the appellant.
>
> On September 16, 1994, Ms. Huff gave birth to a daughter, Ashley Denise. The two resided with Ms. Huff's parents at their Hernando residence. In the summer of 1996, Tammy Huff and the appellant reconciled and were remarried on July 12, 1996. In August, the appellant, Huff, and their daughter moved to an apartment in Memphis.
>
> Soon after moving into the apartment, Tammy began "potty training" Ashley. During the time, Tammy recalled that the appellant "would fuss at [Ashley] and tell her that if she didn't get potty-trained he was going to give her a whipping." Although Tammy never saw her husband spank Ashley, she did hear him threaten to "whip" her for not using the "potty." Tammy admitted that when she confronted the appellant about his threats, he stated that he was not "going to

-2-

whip her." She further admitted that the appellant would chastize her for physically reprimanding the child.

Ms. Huff testified that she was unhappy in her marriage to the appellant. On September 12, she decided to leave him. She telephoned her parents and told her father that she wanted to come home. Mr. Banks informed Tammy that "if she was going to come [home] that she was going to stay." After Tammy made this telephone call, the appellant confronted her with his disbelief that she was actually going to leave him. She explained that the appellant became angry and "he like started choking me." The appellant relinquished his hold and again began asking Tammy why she was leaving him. She responded, "Because you're mean and I don't trust you." "[The appellant's] eyes like turned red, and ... he started coming after me . . . ." He placed a knife to her throat and warned her, "If you leave me, you know, I can, you know, I can kill you. I don't have anything to lose." He then forced Tammy to telephone her parents and tell them that she was not going home.

Ms. Huff testified that the following morning she took Ashley to daycare. The appellant got off work at 12:30 and he picked Ashley up from the daycare center. Tammy did not see Ashley again until 6:30 that evening when the appellant brought Ashley by Tammy's place of employment. Tammy was eating her dinner at this time. Ashley sat on Tammy's lap and ate some chicken nuggets and a brownie. Ashley appeared healthy at this time. Shortly thereafter, the appellant and Ashley left and Tammy returned to work.

At approximately 8:00 p.m., Rita Griffin, a neighbor of the Browns, returned to her residence at the Woodlake apartment complex in Memphis. As she reached the top of the stairs leading to her apartment, she saw the appellant coming out of his apartment. The appellant was carrying his two-year-old daughter, Ashley. The child "was laying on his shoulder . . . it seemed like she was asleep." Ms. Griffin entered her apartment and made a telephone call. Within two minutes, she heard "beating" at her door and asked who was there. The appellant identified himself and exclaimed that "[his] baby fell down the stairs." Ms. Griffin let the "very upset" appellant inside her apartment. The appellant told her that he had sat the child on the steps while he returned to his apartment to get his keys. When he came back outside, he saw that Ashley was on the ground; "she had

fallen down the steps."[1] Ms. Griffin then telephoned for medical assistance. Meanwhile, the appellant sat down in a chair and began rocking the child, saying "Ashley, Ashley, wake up." Ms. Griffin observed that the child was gasping for breath and was trying to open her eyes. The appellant was shaking the child in an attempt to revive her. The 911 operator obviously overheard the comments and advised Ms. Griffin to tell the appellant not to shake the child. The appellant then attempted to give the child CPR. During this time, Ms. Griffin was unable to observe whether the child had any bruises, cuts or abrasions on her legs, arms or face.

At 8:30 p.m., Tammy received a telephone call from the appellant. He informed her that Ashley had fallen down the stairs. Tammy could hear an ambulance in the background. The appellant drove to Tammy's place of employment and the two proceeded to LeBonheur Hospital. On the way to the hospital, the appellant told Tammy that he forgot his keys and he sat Ashley on the steps. When he came back outside, Ashley was at the bottom of the steps. She stated that the appellant, despite emphasizing that Ashley's condition was serious, was not crying. The appellant attempted to console his wife, telling her that Ashley was going to be fine.

Dr. Jeffrey Eugene Schmidt, a pediatric intensive care physician, testified that he was on duty when twenty-four month old Ashley Brown was brought to the hospital. Ashley was transferred to ICU from the emergency room at approximately 2:00 a.m. The reports from the ER indicated that the patient had "severe neurologic injury." Upon admission to ICU, it was determined that Ashley had "severe neurologic devastation, severe brain injury."[2] "From direct observation, there was no evidence of any external trauma. No scratches, bruises, bumps, no swelling, no cuts." A CAT scan did not show any signs of severe bleeding. However, the attending physicians observed retinal hemorrhages that were classified as "fairly severe." Dr. Schmidt testified that based on the presence/absence of injuries, he determined that the injury was what is known as "acceleration-deceleration syndrome." Specifically, he explained:

---

[1] The stairs outside the apartment were made of metal and exposed aggregate concrete surface.

[2] Dr. Schmidt explained that the degree of brain injury is measured by the "glasgow coma score." The score ranges from 3 to 15. A normal person will have a score of 15. When Ashley arrived at the ICU, "her score was four . . . . and three is basically no brain function."

-4-

The brain sits in a fluid filled sac called the dura. And especially in little children and babies, the ability for the brain to move within that sac is far more than adults. In fact, in adults it doesn't move much at all. In babies it can move enough that the connections between the brain and the dura, the tiny blood vessels can get sheared. The other-the nerve fibers, too, and the nerve cells can get sheared if there's a sudden impact or acceleration-deceleration force. And then that's also the same explanation for the tiny vessels in the back of the eye. Because of a sudden acceleration-deceleration force, these tiny vessels get ruptured and cause the bleeding, the hemorrhages in the back of the eye.

Dr. Schmidt advised that "acceleration-deceleration syndrome" was commonly recognized as "shaken baby syndrome." The only other explanations consistent with these injuries would be from "major trauma like high-speed motor vehicle accidents, falls from extreme heights," but not falling down a flight of stairs. The "shaking" involved in "shaken baby syndrome" would have to be "extreme, severe, out of control," "shaking back and forth violently," "it requires the head to be snapped back and forth."

Dr. Schmidt testified that the appellant had informed him that Ashley had fallen down the stairs outside their apartment. Dr. Schmidt was suspicious of this statement because it did not comport with the degree of injury received by the child and the injuries to the child were inconsistent with an accidental injury. He explained that if a two-year-old child fell down thirteen or fourteen raised concrete and metal stairs, he would expect to find:

> some external evidence of either cuts, abrasions, bruises. If there was neurologic injury, then I would expect that . . . her head would have had to have hit something and there would be either bruising, bleeding, cuts, abrasions, something that would show that her head struck . . . the step or . . . some evidence of external trauma.

No evidence of external trauma was present on the victim's person. Dr. Schmidt opined that "[t]he only way that a child could have brain damage as severe as [the victim], . . . is the shaking that

would cause the severe damage to the brain cells." In support of his conclusion, he stated that the brain injury was inconsistent with the mechanism of a fall down the stairs and there was the presence of retinal hemorrhages which you would definitely not see from a fall down the stairs. The victim died on September 15, at 11:55 p.m. Her death was due to both heart and lung failure.

Dr. Schmidt testified that his concern over the appellant's explanation of the victim's injuries led him to speak with Tammy Huff's mother and sister. Both women expressed concern for Tammy's safety. When confronted by the evidence from the autopsy of bruising to the victim's buttocks and lower back, Dr. Schmidt refused to change his opinion, concluding that a fall would not have produced a "pattern" bruise. Instead, Dr. Schmidt concluded that a pattern bruise to the victim's buttocks would confirm his conclusion of abuse.

Dr. Wendy Gunther, an assistant medical examiner for Shelby County, performed the autopsy on the victim. Her examination revealed "some bruising on [the victim's] left arm and on her buttocks," however, she observed "no abrasions, no lacerations." Dr. Gunther concluded that the bruising on the buttocks was "consistent with somebody having struck her repeatedly . . . ." Dr. Gunther explained that this bruising was difficult to see with the naked eye for several reasons. "One is that bruises in children with dark brown skin are often hard to see, and the other reasons were because of livermo[r]tis. When the dead person is lying face up, the blood collects in their back, so everything looks kind of dark red." The bruise measured an area of 5 X 5 inches. This bruising was determined to be "fairly fresh. It had not been a long time before she was injured or died that this happened." Dr. Gunther admitted that the bruises could have been caused "by a very unusual fall." Based upon the post-mortem examination, Dr. Gunther concluded:

> I think Ashley Brown died of shaken baby syndrome. When you take a child . . . and you shake them really, really, really hard, you can scramble the neurons. The axons break apart and the neurons die . . . . There is no other injury which can explain why she went into a coma and never came out . . . [w]hy all the neurons in her brain either died or were starting to die other than shaken baby.

In refuting the appellant's explanation that the child fell down the stairs, Dr. Gunther continued:

> If this child fell down a flight of concrete steps, she didn't sustain any injury. There's no skull fracture, there's no major bleeding next to the brain, there's no fractures of her arms or legs or her collarbones or ribs. There's no bruising to show where she might have hit the steps. The only bruising is that bruise on her arm and the bruising on her buttocks. I don't understand how she could have fallen down a flight of 16 steps without sustaining any injury . . . . [T]he only thing she can have died of is shaken baby syndrome, for she has no injury to her brain except the injury of shaking.

In his defense, the appellant presented the testimony of A[rd]ena McCoy. McCoy testified that the appellant is the father of four of her five children. She stated that she and the appellant shared a home together in Greenville, Mississippi, from May 1994 to May 1996. They also lived together prior to this period. While the couple lived together, the appellant was responsible for the care of the children while McCoy was at work. McCoy also testified that she never saw the appellant physically reprimand any of the children and he cautioned her never to "hit them." In essence, McCoy was of the opinion that the appellant was an excellent father and that he could never have harmed a child.

Arusher Sturdevant, the appellant's cousin, testified that, on September 13, 1996, he was at his brother's house between 2:00 and 3:00 p.m. playing dominoes. The appellant arrived at the residence. He had Ashley with him. At first, the appellant tended to Ashley, but when a neighbor's child came over and started playing with Ashley, the appellant joined the domino game. Two hours later the appellant and Ashley left. Roosevelt Robinson, another of the appellant's cousins, confirmed that the appellant had been at his house playing dominoes on September 13.

The thirty-two-year-old appellant testified that he has ten or eleven children.[3] He stated that he met Tammy Huff at Delta State University in November 1993. They married in April 1994 and divorced soon thereafter. Tammy was pregnant at the time of their

---

[3]The appellant explained that he was not sure whether one child was actually his.

marriage. The appellant did not see Tammy again until May 1996 when he saw her at his mother's house in Greenville, Mississippi. This was the first time that the appellant saw his daughter, Ashley. During this meeting, the appellant and Tammy decided to "try to give it another try" even though the appellant had been living with A[rd]ena McCoy. In early August, the appellant, Tammy and Ashley moved to Memphis.

The appellant recalled that, on the evening of September 12, Tammy was disgruntled with him because he was late picking her up from work and accused him of being with another woman. An argument ensued and Tammy threatened to leave him. Tammy telephoned her mother and told her she was coming home. She then proceeded to the door when the appellant grabbed her and told her to sit down. Tammy sat down and the couple talked. "Everything was normal after that."

The following day the couple took Ashley to daycare and then each left for their respective jobs. At lunchtime, Tammy delivered the car to the appellant since he got off work before she did. The appellant got off work at 2:30 p.m. and went home. The appellant changed clothes and then picked Ashley up at daycare. He then went to his 4:30 appointment with his insurance company. After the meeting, the appellant and Ashley went to the home of the appellant's cousin. Shortly after 5:00 p.m., he took Ashley to McDonald's where she got some chicken nuggets. Between 5:30 and 6:00 p.m., he drove to Tammy's place of employment. Tammy came out to the car and they discussed repairing their automobile. She stayed in the car for about thirty minutes, during which time she played with Ashley and fed her something to eat. The appellant then went to his cousin's house where he visited for a while and then returned home. Following this testimony, the appellant reiterated his version of the circumstances leading to the death of Ashley Denise Brown.

State v. Benjamin Brown, No. W1999-00327-CCA-R3-CD, Shelby County (Tenn. Crim. App. Oct. 24, 2000) (footnotes in original).

**I**

In his first issue, the defendant argues that the trial court erred in admitting testimony of James Banks, Tammy Huff, and Ardena McCoy about the defendant's character as a bad husband, poor son-in-law, and violent person, without first conducting a jury-out hearing to determine the admissibility of this evidence. The state argues that the defendant objected only to James Banks'

-8-

testimony about the telephone call he received from Ms. Huff on the night before the victim was injured regarding Ms. Huff's coming home, that he did not object to the testimony of Huff or McCoy, and that the defendant's own testimony covered many of the subjects about which he complains on appeal. The state argues that admission of the evidence was not error, but that if error, it was harmless.

## A.      Admission of James Banks' Testimony

During James Banks' testimony, the witness was asked about having spoken with Ms. Huff the night before the victim's injury and about what Mr. Banks told Ms. Huff. The defense objected, and the state asserted it intended to introduce evidence that the defendant and Ms. Huff had a confrontation that evening and of what Banks told Huff when she called him that evening. The state said it did not intend to offer evidence of any marital issues which were more remote in time and argued that the evidence should be admitted because it was relevant to the defendant's state of mind and the circumstances surrounding the case. The trial court ruled that Mr. Banks would be allowed to testify about what he told Ms. Huff because it was relevant to the events surrounding the incident on trial. Thereafter, Mr. Banks testified about telling the victim she could come home but would need to remain there if she did so. Mr. Brown did not testify about any altercation between the defendant and Ms. Huff on the night of the telephone call. Mr. Banks did not testify until cross-examination about his displeasure in learning of the defendant's other family obligations at the time of the defendant's first marriage to Ms. Huff and his reservations about Ms. Huff reuniting with the defendant.

The defendant's challenge is based upon Tennessee Rule of Evidence 404(b), which prohibits the introduction of evidence of other crimes or acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent, or absence of mistake or accident, and its probative value is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. The rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for some other purpose. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

The trial court ruled that Rule 404(b) did not apply because what Mr. Banks said to his daughter did not amount to a bad act of the defendant. Mr. Brown did not testify about any of the defendant's actions that evening. The court did not abuse its discretion in admitting the evidence.

## B. Admission of Tammy Huff's and Ardena McCoy's Testimony and Cross-Examination Questioning of McCoy

The defendant also complains on appeal about portions of the testimony of Tammy Huff and Ardena McCoy and certain questions McCoy was asked on cross-examination which the defendant claims implied bad acts on his part. The testimony of Ms. Huff involved the circumstances of her brief first marriage to the defendant, a serious altercation with the defendant the night before the victim's injury, the residual tension the day after the altercation, and Ms. Huff's unhappiness in her second marriage to the defendant. The defendant also claims that the state implied he was involved in a plot with Ardena McCoy to damage his marriage to Ms. Huff. He bases this claim on the state having obtained Ms. McCoy's admission on cross-examination that she told Ms. Huff that the defendant was only marrying her until he could establish himself in Memphis and planned to leave her and resume his relationship with Ms. McCoy, even though she admitted the defendant had not told her this. The defendant also complains that the state questioned Ms. McCoy about whether she had attempted to slash Ms. Huff's tires, whether she threatened Ms. Huff with a crowbar, and whether she had called Ms. Huff and said for Ms. Huff to leave the defendant alone because he was Ms. McCoy's, all of which Ms. McCoy denied.

Despite these complaints, the defendant did not object contemporaneously to any of the testimony or cross-examination of Huff and McCoy. As a prerequisite to challenging on appeal the admission of evidence, the party opposing admission must have made a contemporaneous objection at trial. State v. Halake, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001); State v. Hopper, 659 S.W.2d 530, 536 (Tenn. Crim. App. 1985); see generally Tenn. R. Evid. 103(a)(1); T.R.A.P. 36(a). If the party fails to object, the evidence becomes admissible notwithstanding contrary provisions of the Rules of Evidence. State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000). Thus, we will not consider the defendant's appellate issue as it relates to the admission of the challenged testimony Huff and McCoy or the state's cross-examination questioning of McCoy.

In so holding, we are not unmindful of the defendant's argument that all of the referenced evidence and questioning, viewed in its totality, demonstrated or implied bad conduct on the part of the defendant. We are also not unmindful of the defendant's request during Mr. Banks' testimony for a Rule 404(b) hearing. However, the court ruled that a Rule 404(b) inquiry was not in order relative to Mr. Banks' testimony and limited its ruling to the narrow issue of whether Mr. Banks could testify about what he told Ms. Huff in the September 12 telephone call. We note that the

defendant never made a 404(b) objection or requested a 404(b) ruling during the testimony of Ms. Huff and Ms. McCoy.

**II**

Next, the defendant claims that the trial court erred in allowing Doctor Gunther to testify about the victim's cause of death without having established a proper foundation for her opinion. His specific complaint is that the witness offered expert opinion testimony about the victim's cause of death based upon her examination of slides made of the victim's preserved brain in 1999, despite the original autopsy having been performed in 1996 and the original slides having been lost in the interim. The defendant concedes that the defense did not make a contemporaneous objection to the evidence at trial but argues for relief on the basis of plain error. The state argues that no plain error has been shown.

Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

We hold that although the record clearly establishes what occurred in the trial court and does not reflect that the defendant waived the issue for tactical reasons, the defendant cannot establish that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that consideration of the issue is necessary to do substantial justice. The record reflects that Doctor Gunther performed the autopsy of the victim in September and October 1996. She acknowledged on cross-examination that slides and her report of the pathology work done on samples of the victim's brain were misplaced and that she took new samples from the victim's preserved brain, made new slides, and examined them in 1999 and created an addendum to her 1996 report. She explained, "And I recall that November of 1996 was about the time the histology laboratory, which had been kept in the Department of Pathology for decades, was being shut down and downsized, and all the slides were being moved to Memphis Pathology Laboratory. And I expect they got lost in the shuffle." She said she could have testified from her own memory and from the report of the neuropathologist, but in order to be complete, she took new samples from the victim's brain, which

had not been misplaced and was preserved in formalin, and she repeated the examination procedure. She said her findings in 1999 were consistent with her 1996 conclusion that the victim died from shaken baby syndrome. We perceive no breach of a clear and unequivocal rule of law in the admission of the evidence nor any effect on a substantial right of the defendant. We note, as well, Doctor Schmidt's testimony was consistent with that of Doctor Gunther with respect to the cause of the victim's injury and resulting death. Even if Doctor Gunther's testimony had been erroneously admitted, we would be unable to conclude, based upon the additional testimony of Doctor Schmidt, that consideration of the issue was necessary to do substantial justice. For these reasons, we hold that the defendant cannot establish all of the prerequisites to plain error relief.

### III

The defendant argues that the trial court erred in denying his request to replace a juror with an alternate once the juror revealed that her roommate knew one of state's witnesses. The juror informed the court that she was "just about positive" that her college roommate, who was now a medical student, had gone "on the rotation with [state's witness Doctor Schmidt] in the ICU" and that her college roommate referred to the doctor with whom she had done rounds as "Jeff." The juror said she did not know the doctor personally, although she had also gone on hospital rounds and would be enrolling in medical school herself in a few months. The juror stated that she could be objective and follow the instructions of the court in evaluating the witness's testimony. The trial court ruled that there had not been a sufficient showing for removal of the juror. The state argues that the trial court did not commit error in determining that the juror could serve impartially.

Challenges to juror qualifications generally fall into two categories - propter defectum or propter affectum. State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. Id. An objection based upon bias, prejudice, or partiality is classified as propter affectum and may be made after the jury verdict is returned. Id. "Once a jury is impaneled, jurors may be discharged from further service prior to deliberations only if found by the trial court to be 'unable or disqualified to perform their duties.'" State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (quoting Tenn. R. Crim. P. 24(e) (now Tenn. R. Crim. P. 24(f)(2)(B)); see T.C.A. § 22-2-312. "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993) (citing State v. Taylor, 669 S.W.2d 694, 698-700 (Tenn. Crim. App.1983) and Bowman v. State, 598 S.W.2d 809, 812 (Tenn. Crim. App.1980)).

In the present case, the juror stated that she did not know the state's witness, although she had heard her college roommate speak of making rounds with a doctor she thought might be Doctor Schmidt. She stated that she could be impartial and follow the trial court's instructions. The defendant has the burden of demonstrating bias or prejudice, and he has not done so. We hold that the trial court did not err in refusing to remove this juror.

## IV

In his next issue, the defendant argues that the trial court erred in failing to instruct the jury on the lesser offenses of the felony murder charge. The state argues that the defendant is not entitled to relief because there were no facts from which an inference of guilt of second degree murder could be drawn, that the defendant invited error as to the lesser included offense of criminally negligent homicide by requesting that lesser offense instructions not be given, that there was no proof of recklessness to support a reckless homicide charge, and that any error in the failure to charge reckless homicide was harmless.

Pursuant to the statute in force at the time of the offenses on trial, the trial court was required "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." T.C.A. § 40-18-110(a) (1997). Thus, when the evidence introduced by either party was susceptible of inferring guilt of a lesser offense, the trial court was required by this statute to charge such lesser offense. See T.C.A. § 40-18-110(a); Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). An instruction was not required, though, if the record contains no evidence to support a conviction for the lesser offense. State v. Trusty, 919 S.W.2d 305, 311 (Tenn. 1996), overruled by State v. Dominy, 6 S.W.3d 472, 473 (Tenn. 1999). In this regard, "the trial court must consider the evidence in the light most favorable to the existence of the lesser included offense and if the evidence so considered permits an inference of guilt of a lesser offense, the trial court must give instructions as to that lesser offense." State v. Brooks, 909 S.W.2d 854, 861 (Tenn. Crim. App. 1996).

The defendant was charged with and convicted of first degree felony murder. At the time of the offense, the relevant statute provided:

> (a)    First degree murder is:
> . . .
> (2)    A killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse . . . ;
> . . .
> (b)    No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts . . . [.]

T.C.A. § 39-13-202(a)(2), (b) (Supp. 1996).

The aggravated child abuse statute provided, in pertinent part:

> (a)    A person is guilty of the offense of aggravated child abuse who commits the offense of child abuse as defined in § 39-15-401 and:
> (1)    The act of abuse results in serious bodily injury to the child[.]

T.C.A. § 39-15-402(a)(1) (Supp. 1996). The child abuse statute provided, "Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child as to adversely affect the child's health and welfare is guilty of a Class A misdemeanor; provided, that if the abused child is six years of age or less, the penalty is a Class D felony[.]" T.C.A. § 39-15-401(a) (Supp. 1996).

The record reflects that the trial court informed the parties that it would be instructing the jury on felony murder without any lesser offenses. Despite the state bringing Trusty to the court's attention and stating that the defense proof might call for an instruction on criminally negligent homicide as a lesser offense, the defendant declined lesser included offense instructions. Without regard to the defendant's desire regarding lesser included offense instructions, the trial court had an independent duty to instruct the jury on all applicable lesser included offenses. T.C.A. § 40-18-110(a); State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998). Thus, the defendant's failure to request the instructions is not determinative.

Second degree murder is "a knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b); see State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Considered in the light most favorable to the existence of the offense, the evidence in the present case would not support a conviction of second degree murder. There was no evidence the defendant acted knowingly in causing the victim's death. The defendant's theory of the case was that he did nothing to harm the victim and that she was injured when she fell down a flight of stairs. No instruction was required on the lesser offense of second degree murder.

"Reckless homicide is a reckless killing of another." T.C.A. § 39-13-215.

> 'Reckless' refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(d). Considered in the light most favorable to the existence of the lesser included offense, the evidence does not support a conclusion that the defendant was aware of a substantial and unjustifiable risk of the victim's death. The defendant testified that he had seen the victim walk up and down the stairs before. There was no evidence he realized any danger in placing her at the top of the stairs. The trial court did not err in not instructing the jury on reckless homicide.

"Criminally negligent conduct that results in death constitutes criminally negligent homicide." T.C.A. § 39-13-212.

'Criminal negligence' refers to a person who acts with criminal negligence with respect to the . . . result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(d). Considering the evidence in the light most favorable to the existence of the lesser offense, the evidence supported an instruction on criminally negligent homicide. The defendant's proof would support a conclusion that the defendant should have been aware of a substantial and unjustifiable risk that leaving the victim unattended at the top of the stairs would result in her death. Therefore, we must consider whether the failure to give the instruction was harmless beyond a reasonable doubt. State v. Ely, 48 S.W.3d 720 (Tenn. 2002). In that regard, we note that although the defendant offered evidence that the victim was injured by falling down the stairs, his proof did not address the inconsistency of that account with the nature and magnitude of the victim's injuries. All of the medical proof refuted the accuracy of the defendant's account. Additionally, the jury's rejection of the defendant's theory of accidental injury is evident by its separate verdict of aggravated child abuse. We hold that the failure to give the instruction on criminally negligent homicide was harmless beyond a reasonable doubt. See id. at 726; State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998).

**V**

In his final issue, the defendant claims that the trial court erred in allowing the state to make inflammatory closing argument which compared the defendant to serial killers and characterized the defendant as a "practiced liar." The state argues that the argument was proper rebuttal argument to the defendant's closing argument, but even if error, it was harmless.

The argument in question was part of the state's rebuttal argument:

> [PROSECUTOR]: . . . And as far as what [the defendant] or how he appeared on the stand, [defense counsel] wanting to make him out to be citizen of the year, well, think about Ted Bundy that went around the country killing women. Do you think any of them would have gotten in the car with him if he looked like a killer? Think about John Wayne Ga[c]y in Chicago, do you think any of those young boys would have with their parents['] consent –
>
> [DEFENSE COUNSEL]: Objection, Your Honor.
>
> [PROSECUTOR]: – let them go into the house.

-15-

THE COURT: Counsel approach the bench, please.

(Bench conference was held.)

[DEFENSE COUNSEL]: Judge, I think the argument has been made about these mass murderers and that's totally inappropriate, Judge. There's got to be some semblance or relationship between the facts and this case.

[PROSECUTOR]: And, Your Honor, I'm making an example, you can't tell a book by its cover. And with all the latitude that's been granted [defense counsel], I think I'm perfectly within the realm of appropriate argument. This is not a case which will tell –

[DEFENSE COUNSEL]: She can make that statement without referring to mass murderers and comparing, making the comparisons between the two here.

[PROSECUTOR]: This is a murder case. I'm not calling him a mass murderer.

THE COURT: I'm going to allow it because of what's been said earlier.

[PROSECUTOR]: Thank you, Your Honor.

(Bench conference concluded.)

[PROSECUTOR]: As I was saying, ladies and gentlemen, do you think any of those mothers would let their children go into the home of John Wayne Ga[c]y dressed up like a clown if they had known he was going to rape and murder their children? Of course not. You can't tell what somebody is capable of doing by looking at them. What does a child abuser look like? I wish I had my hand mirror or my bathroom at home because here's what one looks like. Like me. And like you. And that's a face that's hidden. That's a crime that's done behind closed doors. It's not done in front of the Pyramid. Remember.

So if you thought that he came across well, that was your impression. You remember. You don't judge a book by its cover. And if he appeared credible, then you remember he's a practiced liar because he's been deceiving people for years and he's had a long time

-16-

to get good at it. And as Mr. Garrett said several times in his closing remarks, I didn't make that up. That was proof. That was proof for Ms. McCoy who was living with the man and had a baby with him, several babies with the man, and had no idea that he had another girlfriend that was fixing to marry until two days before. That was Tammie Brown who had found out he had two children but didn't know he had all the rest. This case isn't about the man having too many children. This was one example that we could show you of how he deceived people and how he was willing to lie.

And he's willing to take that stand and lie to you as well. Why? Who's going to stand up and shake a baby like Dr. Gunther did in front of anybody? I hope you do have your common sense. Do you have it on still? I hope we haven't stripped you of that in the course of these proceedings because that's what you need to evaluate this case. That's what you need to sift through some of the statements that have been made to you this morning.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the state's conduct could have improperly prejudiced the defendant and affected the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

See also <u>State v. Buck</u>, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

Initially, we note that the defendant did not make a contemporaneous objection to the prosecutor's characterization of him as a "practiced liar." The failure to object contemporaneously constitutes a waiver. T.R.A.P. 36(a); <u>State v. Little</u>, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives any later complaint). Thus, we will limit our consideration to the references to serial killers. In that regard, we note that the context in which the assistant district attorney mentioned Ted Bundy and John Wayne Gacy was in rebutting the defendant's argument which characterized him as a caring father and husband who had been "set up" in a rush to judgment by the authorities and Tammy Huff's family. The state responded by demonstrating that the defendant was a deceitful person as shown by the testimony and by arguing that his appearance and demeanor, like that of Bundy and Gacy, could be deceiving. We believe the reference to notorious serial killers was improper because of its inflammatory nature. <u>See State v. Lonnie Turner</u>, No. M1999-01127-CCA-R3-CD, Rutherford County (Tenn. Crim. App. June 5, 2001) (characterizing prosecutor's likening defendant to notorious serial killers as "clearly improper"), <u>app. denied</u> (Tenn. Dec. 10, 2001). The trial court should have sustained the defense objection and instructed the jury to disregard it. However, in the context of the entire argument, the overwhelming proof of the defendant's guilt, and the lack of other significant errors in the record, we cannot say that this argument affected the verdict to the defendant's prejudice.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE